**V–M CORPORATION, Plaintiff-Appellee,**

v.

**BERNARD DISTRIBUTING COMPANY, Defendant-Appellant.**

**No. 18218.**

United States Court of Appeals, Seventh Circuit.

July 22, 1971.

Rehearing Denied Aug. 23, 1971.

Joseph Z. Sudow, Larry M. Leiken, Kavanagh, Scully, Sudow, White & Frederick, Peoria, Ill., for defendant-appellant; James B. Lewis, Peoria, Ill., of counsel.

Duane L. Traynor, Traynor & Hendricks, Springfield, Ill., Gordon T. Roberts, Boston, Mass., for plaintiff-appellee.

Before KILEY and CUMMINGS, Circuit Judges, and CAMPBELL, Senior District Judge.[1]

CUMMINGS, Circuit Judge.

Plaintiff V–M Corporation is a Benton Harbor, Michigan, manufacturer of tape recorders, record players, and other electronic equipment. Defendant Bernard Distributing Company is a Peoria, Illinois, distributor of electronic equipment and floor coverings. In this diversity action, V–M sued Bernard for $26,333.47 for goods allegedly sold and delivered to Bernard between August 1965 and May 1966.[2] After filing its answer denying the allegations of the complaint, Bernard filed seven counterclaims based upon V–M's failure to supply goods of adequate and saleable quality.

The trial court dismissed the last four counterclaims on the ground that they were barred by the wholesale distributor agreement between the parties. Subsequently, the court also granted V–M's motion for summary judgment on Bernard's first two counterclaims, on the ground that the wholesale distributor agreement precluded any claims for actual and anticipated loss of profits due to defective merchandise supplied by V–M. Thereafter Bernard amended its answer by incorporating therein a claim to set-offs in the amount of $13,714.13. This claim had been the substance of Bernard's third counterclaim, which was dismissed on Bernard's own motion. After a jury trial, V–M's damages were assessed in the amount prayed, without any set-offs for Bernard. Bernard appeals from the judgment on the jury verdict and from the dismissal of the six remaining counterclaims. We affirm.

The record shows that Bernard and V–M began extensive dealings in October 1952. At that time, Bernard and V–M executed a written service agency agreement, making Bernard an authorized agent to service V–M's products in the State of Illinois. That same month, Bernard commenced distributing V–M products through an oral agreement. A written wholesale distributor agreement was first formally executed in August 1955. That agreement expired on De-

---

1. Senior District Judge Campbell of the United States District Court for the Northern District of Illinois is sitting by designation.

2. At the trial the *ad damnum* was reduced to $25,959.62 because V–M had failed to give Bernard a $373.85 credit for two returned units.

cember 31, 1955. On February 16, 1956, the parties executed a second wholesale distributor agreement identical in form. This agreement was to be effective through December 31, 1956, and was subsequently renewed yearly by letter.

According to Bernard, dealings between the parties continued smoothly until the latter part of 1964 and 1965. At that time, V–M introduced transistorized components in the manufacture of its products, with substantial changes in the electronic design of many of its models. These innovations assertedly coincided with a sharp decline in the quality of V–M's products. As a result, the number of units returned to Bernard and dealers for credit or warranty repair soared, and the demand for V–M products declined. Bernard complained to V–M about the excessive costs and diminished demand throughout 1965.

Finally, in February 1966, after unsuccessful attempts by Bernard to change the terms of the distributorship agreement, V–M wrote Bernard saying that it accepted Bernard's decision to relinquish the V–M line of products. V–M then stopped shipping merchandise to Bernard for wholesale distribution. V–M also sought termination of the service agency agreement as of March 31, 1966, and it ceased shipping parts to Bernard after May 5 of that year.

At the time the distributorship agreement expired on December 31, 1965, Bernard was indebted to V–M in the amount of $51,795.81 for merchandise sold under that agreement. On November 30, 1966, after fruitless settlement negotiations, V–M wrote Bernard to return all V–M products and parts on hand for credit. When this was accomplished, V–M's claim was reduced to $26,333.47.[3] After further acrimonious correspondence between the parties, V–M filed its complaint on September 13, 1967.

I

Bernard first argues that at the trial, the court improperly held that to establish its right to set-offs, Bernard must "prove V–M specifically agreed to the reimbursements sought and that the written agreements were controlling." Our examination of the record does not bear out this assertion. The district court recognized that Bernard would be entitled to set-offs where V–M had waived the contractual terms. See Ill. Rev.Stats., 1969, Ch. 26, § 2–208(3). Bernard has cited no authorities to show that V–M's offered waiver of certain contractual requirements during pre-litigation negotiations would absolutely bar V–M from relying on the contracts to defend against claimed set-offs at the trial. Cf. Buono Sales, Inc. v. Chrysler Motors Corporation, 363 F.2d 43, 49 (3d Cir. 1966), certiorari denied, 385 U.S. 971, 87 S.Ct. 510, 17 L.Ed.2d 435. Insofar as V–M was compelled to defend against the set-offs alleged by Bernard, V–M was entitled to rely on unwaived requirements of the written agreements. The jury was rightly permitted to credit Bernard's account with set-offs where V–M was found to have waived the written agreements or portions thereof, so that the court below did not err in this regard.

II

Bernard next complains of the wrongful exclusion of several exhibits dealing with its claimed set-offs under the wholesale distributor's agreement.

The first of these exhibits consisted of a table showing that as a distributor Bernard was allegedly entitled to a credit of $361.85 for advertising and display material returned to V–M in 1967. Paragraph 14 of the wholesale distributor's agreement, however, only covered V–M repurchases of "products and repair and replacement parts therefor which are now new and unused." Bernard did not show why it would be

---

3. See note 2, *supra*.

entitled to a credit for advertising and display materials under that or any other agreement. No instances of waiver had been shown with respect to this matter, and the district court correctly refused to permit the jury to consider this evidence.

■ Bernard's second such exhibit consisted of a table supporting its claim as a distributor to $469.11 credit for freight and handling charges it incurred as to 210 units returned to Bernard by its dealers. The record does not show that V–M was responsible for such charges. As in the case of the first of these exhibits, nothing in either agreement provided for V–M's assumption of such liability. Moreover, the exhibit does not indicate actual costs, but shows estimates based upon random samples. The trial judge properly excluded this exhibit.

■ Bernard also urges that a third exhibit should have been received in evidence. This was a November 18, 1966, letter from Bernard's president to V–M's president demanding $38,595.84 for its "extra costs" occasioned by service problems with V–M units. Bernard insists that this exhibit was admissible because at trial V–M's counsel sought to show that Bernard had not made a demand upon V–M for credits and reimbursements. We have found no such argument by V–M counsel in the trial record. Other received exhibits showed that Bernard had made demands upon V–M. In addition, this particular exhibit was not confined to the recovery sought by Bernard in its claim for $13,714.13 in set-offs and was therefore irrelevant. Furthermore, it lacked documentation supporting the demanded credits. Accordingly, the exclusion of this letter was within the trial court's discretion.

### III

■ Bernard also objects to various instructions on the ground that the jurors would consider that they could not award Bernard any set-offs unless based on the written agreements between the parties. Bernard's counsel did not, however, object to these three instructions below, so that error may not now be assigned in giving them. Rule 51 of the Federal Rules of Civil Procedure. Furthermore, the objections are without merit, for Instruction 4 informed the jury that the parties would not be bound by the written agreements if the jury decided that there had been a waiver. In addition, the court instructed the jury it should deduct from any V–M recovery the amount of set-offs to which the jury should find defendant was entitled. In our view, the relatively simple instructions given were not misleading and did not confuse the jury.

### IV

Bernard's final arguments deal with the dismissal of six of its counterclaims, as barred by terms of the wholesale distributor's agreement. In denying Bernard's claim to set-offs under Instruction 4 *supra,* the jury necessarily found that V–M had not waived this agreement. Bernard does not assert that this finding of the jury was unwarranted, so that we need not consider Bernard's persistent assertions that the wholesale distributor's agreement is inapplicable due to waiver.

■ Bernard again asserts that the parties totally ignored the contractual provisions during the course of their dealings. Bernard claims support for disregard of the contractual limitations on V–M's liability from Section 2–208 of the Commercial Code.[4] Calling atten-

4. Section 2–208 provides:
"Course of Performance or Practical Construction. (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other,

any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage

tion to the acceptance of approximately 210 units for credit late in 1965, as well as the previously mentioned prelitigation negotiations between the parties, Bernard appears to argue that the course of dealings between the two companies diverged from the contract and provides the basis for inferring different legal obligations and rights from those expressly stated in the written agreement.

Apart from waiver, however, Section 2–208 expressly limits the relevance of course of dealings to construction of contractual terms. Section 2–208(2) explicitly states that where the express terms of an agreement cannot be harmonized with the course of dealings and performance by the parties, the express terms shall control.

In dismissing the counterclaims, the district court relied in part on paragraphs 11 and 12 of the wholesale distributor's agreement. Paragraph 11 was the warranty provision, stating that V–M warranted its products to be free from defective material and workmanship and agreed to remedy the defects or to furnish new parts upon the return of the units. Paragraph 11 concluded:

"This warranty is in lieu of all other warranties expressed or implied

and no representative or person is authorized to assume for V–M any other liability in connection with the sale of our products."

Paragraph 12 was the "Limitation of Liability" provision and stated:

"In no event shall V–M be liable for consequential or special damages, and V–M's liability on any claim for loss or liability arising out of or connected with this agreement, or the sale, resale or use of any product sold pursuant to this agreement shall in no case exceed the selling price of such product or part thereof involved in the claim."

Bernard asserts that although these limitations were authorized by Section 2–719(1) of the Uniform Commercial Code, Bernard was nevertheless entitled to consequential damages under Section 2–719(2) because circumstances caused the limited remedies to fail of their essential purpose.[5] Here, however, V–M gave Bernard the benefit of his remedies under paragraphs 11 and 12, which therefore did not fail of their essential purpose within the meaning of Section 2–719(2). V–M did not fail to meet the obligations under paragraphs 11 and 12, so that it did not deprive

of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (Section 1–205).

"(3) Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." Ill.Rev.Stats., 1969, ch. 26, § 2–208.

5. Section 2–719 provides:
"Contractual Modification or Limitation of Remedy. (1) Subject to the provisions of subsections (2) and (3) of this Section and of the preceding section on liquidation and limitation of damages,
(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and

may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." Ill.Rev.Stats., 1969, Ch. 26, § 2–719.

Bernard of the benefits of the limited warranty provisions. Cf. Jones & McKnight Corp. v. Birdsboro Corporation, 320 F.Supp. 39, 44 (N.D.Ill.1970).

 Moreover, we are not persuaded that Section 2–719(2) otherwise requires the negation of the specific limitations of the contract. Section 2–719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where the defects of the goods cause substantial difficulties to those involved in wholesale and retail distribution, Section 2–719(2) need not automatically require disregard of the particular limitations upon liability specified by the contracting parties. Here we cannot say that the defects in the quality of V–M's goods caused a failure of consideration for the distributorship agreement which would justify altering the particular allocation of these costs by making the manufacturer the insurer of distributor profits and extraordinary expenses. We see nothing in this record to justify protection of the distributor's profits or expenditures at the expense of the manufacturer's.

The district court also relied on the "No Liability for Termination" provision of the wholesale distributor's agreement contained in paragraph 16 thereof. That paragraph provided:

> "Neither V–M nor the Distributor shall, by reason of termination or nonrenewal of the Distributor's distributorship of said products, be liable to the other for compensation, reimbursement or damages on account of loss of prospective profits on anticipated sales, or on account of expenditures, investments, leases, or commitments in connection with the business or goodwill of V–M or the Distributor, or otherwise."

Bernard concedes that this paragraph bars any recovery for prospective profits on anticipated sales. The jury found no waiver of this paragraph. The trial court correctly ruled that pargraphs 11, 12, and 16 of that agreement bar recovery under the counterclaims.

The orders dismissing the counterclaims and the judgment on the verdict are affirmed.